NANCY JANE DUDLEY MAXWELL PUGH HALL, ETC.

V.

COMMONWEALTH OF VIRGINIA

Record No. 860263

April 24, 1987

Present: Carrico, C.J., Cochran,* Poff, Compton, Stephenson, Russell, and Thomas, JJ.

---

\* Justice Cochran participated in the hearing and decision of this case prior to the effective date of his retirement on April 20, 1987.

*Thomas L. Phillips, Jr. (Lisa S. Kalinowski; Kizer, Phillips & Petty; O'Keeffe & Kalinowski*, on briefs), for appellant.
*Eugene Murphy, Assistant Attorney General (Mary Sue Terry, Attorney General*, on brief), for appellee.

RUSSELL, J., delivered the opinion of the Court.

This appeal from a conviction of first-degree murder presents a single question: whether a party whose witness is impeached on cross-examination through use of a prior inconsistent statement is entitled to .a cautionary instruction advising the jury that the statement may be considered only as affecting the credibility of the witness, and not as substantive evidence of its content. We answer that question in the affirmative.

In September 1983, Nancy Jane Dudley Maxwell Pugh Hall (whose surname is now Smith) was indicted in the Circuit Court of the City of Lynchburg for the murder on October 31, 1970, of her then husband, Donald Wayne Pugh. At a jury trial in December 1984, she was convicted and sentenced to life imprisonment. In December 1985, her petition for appeal was denied by the Court of Appeals. We granted an appeal limited to the question set forth above.

Donald Wayne Pugh was killed by gunshot wounds while he was riding as a passenger in an automobile driven by his wife, the defendant, on the Lynchburg Expressway. Immediately after the shooting, the defendant gave several conflicting accounts of the event to the effect that one or more black males, unknown to her, had fired the shots into the car. Susan Sowell, a girl 13 years of age in 1970, gave a statement to a police investigator two years later in which she said that the defendant had told her before the shooting that she disliked Pugh, that she thought she was a beneficiary on his insurance policy, and that she had arranged for James Ward, with whom the defendant was then carrying on an extra-marital sexual relationship, to murder Pugh. The investigator subsequently died and his notes were lost. The defendant was not indicted until 1983.

At trial, the Commonwealth presented the testimony of Susan Sowell and another witness tending to prove that James Ward had killed Pugh at the defendant's behest. The Commonwealth did not call Ward as its witness. After the Commonwealth had rested its case, Ward was called as a witness for the defense. On direct examination, he admitted that he had a sexual relationship with the defendant during her marriage to Pugh, but denied that he was involved in Pugh's murder and denied that he had ever discussed any such thing with the defendant.

The Commonwealth then cross-examined Ward as follows:

Q. Do you remember being interviewed by Investigator Wingfield, with the police, back on September 15th, 1983, about 2:00 p.m.?
A. Yes, sir.
. . . .
Q. Okay. Do you remember being asked the following questions and giving the following answers by Investigator Wingfield? All right. Let me start at the beginning.

[Reading from a transcript]

"Q. [by Wingfield] So you tell me you have some knowledge of it, is that right?

"A. Yes.

"Q. (by Wingfield) What's the knowledge of them?

"A. (by Ward) I was just offered a proposition to get rid of him.

"Q. (by Wingfield) What do you mean get rid of him?

"A. (by Ward) I reckon kill him.

"Q. (by Wingfield) When did she — meaning Nancy, if you read the entire statement, the defendant — tell you about all this? When did she ask you this?

"A. (by you, Ward) I can't recall right offhand. It was a pretty long time ago.

"Q. (by Wingfield) Okay. Now he was killed Halloween night, do you remember whether it was the same day he was killed or what?

"A. (by Ward) No, it was way before that.

"Q. (Wingfield) Way before that?

"A. (Ward) Yes.

"Q. (Wingfield) Do you have any idea how much before that it was?

"A. (Ward) Uh-huh."

Q. Do you remember that?

A. Not all of it. Well, see, that was not right. He asked me a whole lot of questions and kept jumping around asking me did I know anybody gun running and stuff like that.

Q. It was tape recorded. Here's the transcript. (Indicating.) You're more than welcome to read it and refresh your recollection. Tell the jury if you remember saying all that stuff and a whole lot more in there before we go into it any further.

A. (Witness complied.)

Q. Do you remember making those statements?

A. Some of them.

Q. Well, were they true, or were you lying to the police?

A. Well, he was badgering on me so much.

Q. Well, did you lie?

A. Yes.

Q. So all this you told the police was a lie?
A. Yes.
Q. Now did — let me ask you again, did the defendant ever ask you if you would be interested in killing her husband?
A. No, sir.
Q. Do you remember being asked by the detective the following question and giving the following answer?

"Q. (Wingfield) —
[Defense Counsel]: If Your Honor please, it strikes me that the jury probably should be told right at this stage that this is not evidence against Mrs. Pugh. It's merely an attempt to impeach this witness, and I don't think the jury should get the concept of this anyway if it's not evidence against the defendant.
THE COURT: My jury instructions will cover that. It goes to credibility of this witness.
[Defense Counsel]: I think it should be sufficiently pointed out so it will be no question about it.
THE COURT: Well, I'll do it at the proper time. This is not the proper time."

Later, the court ruled that the Commonwealth was not entitled to read the entire statement taken by Wingfield from Ward, but that the Commonwealth could ask the witness if he recalled the questions and if his answers had been truthful. Ward admitted some recollection of giving the statement, denied it in part, and added: "If I said it, I must have been lying." In rebuttal, the Commonwealth called Investigator Wingfield and sought to introduce the statement he had taken from Ward into evidence. The court sustained the defendant's objection to the formal introduction of the statement. The court then permitted Wingfield to testify that he had taken the statement, recorded it accurately, and given it to the Commonwealth, but the statement was not introduced as an exhibit.

At the close of all the evidence, the defendant again requested that the court include, as a part of the general jury instructions, an instruction that Ward's statement to Wingfield "is not evidence against this accused." The court declined to do so on the ground that such an instruction would be a comment on the evidence, and that the matter was sufficiently covered by the court's general in-

struction on the subject of credibility, which told the jury that it might consider any prior inconsistent statements in weighing the credibility of witnesses.

The Court of Appeals, in its order denying the defendant's petition for appeal, concluded that the trial court had not erred in refusing a cautionary instruction because Ward's prior inconsistent statement "was not admitted into evidence." Because the jury heard the content of the statement, we think that to be a distinction without a difference.

It is fundamental to the right of cross-examination that a witness who is not a party to the case on trial may be impeached by prior statements made by the witness which are inconsistent with his present testimony, provided a foundation is first laid by calling his attention to the statement and then questioning him about it before it is introduced in evidence. *Thornton* v. *Downes,* 177 Va. 451, 459, 14 S.E.2d 345, 348 (1941). *See also Roberts* v. *Commonwealth*, 230 Va. 264, 269, 337 S.E.2d 255, 258 (1985). Prior inconsistent statements of this kind, however, are inadmissible hearsay if they are offered to prove the truth of their content because they suffer from all of the usual disabilities of hearsay, *e.g.*, they were made out of court, under circumstances which the jury cannot evaluate; the witness was not under oath when they were made; the jury was unable to observe the demeanor of the witness when making them; and the witness was not available for cross-examination when they were made. For these reasons the common-law rules of evidence, to which we adhere, have consistently required that when such statements are offered for impeachment, the opposing party is entitled, upon request, to a cautionary instruction advising the jury that the statements are to be considered only insofar as they may affect the credibility of the witness, and may not be considered as proof of the truth of their content. *Stoots* v. *Commonwealth*, 192 Va. 857, 866, 66 S.E.2d 866, 871 (1951).

Code § 8.01-403, applicable to civil and criminal cases alike, expressly provides that an adverse witness may be impeached by proof of a prior inconsistent statement, but "[i]n every such case the court, if requested by either party, shall instruct the jury not to consider the evidence of such inconsistent statements, except for the purpose of contradicting the witness." The statute applies only to witnesses on direct examination who "shall in the opinion of the court prove adverse." The common-law rule dis-

cussed above, however, is broader than the statute, and includes witnesses impeached on cross-examination at any stage of the case. The rule is well summarized as follows:

> [P]rior inconsistent statements are admitted solely to attack the credibility of the witness who has told different stories at different times. They are not evidence of the truth of the content of the statements, *and the court must so instruct the jury*.

C. Friend, The Law of Evidence in Virginia § 28, at 73 (2nd ed. 1983) (emphasis added). The opposing party may, of course, waive the benefit of a cautionary instruction if he so chooses, *Manetta v. Commonwealth*, 231 Va. 123, 127, n.2, 340 S.E.2d 828, 830, n.2 (1986), but here the defendant insisted on her right to such an instruction.

■ The Commonwealth argues on appeal that the rule is inapplicable because Ward's statement was never actually introduced in evidence. Because Ward, at least partially, denied making it, the Commonwealth would have had the right to introduce the statement into evidence, for the limited purposes of impeachment, after laying a proper foundation, followed by an appropriate cautionary instruction. The Commonwealth proceeded to lay such a foundation by calling the statement to the attention of the witness and asking him whether he made it. In the course of laying this foundation, the Commonwealth read the relevant questions and answers in the jury's hearing. The effect of that procedure on the jury was the same as if the statement had been formally introduced, and the court's refusal to admit the statement in evidence is immaterial. *See Roberts v. Commonwealth*, 230 Va. at 269, 337 S.E.2d at 258-59 (cautionary instruction properly given where adverse witness impeached by prior inconsistent statement partially read to jury but not introduced in evidence).*

---

\* As the Commonwealth notes on brief, some writers assume that juries are unable or unwilling to follow cautionary instructions, that they are uniformly disregarded, and that such an instruction is a "mere verbal ritual" or "a pious fraud." *See United States v. De Sisto*, 329 F.2d 929, 933 (2nd Cir.), *cert. denied*, 377 U.S. 979 (1964). We are not persuaded to that view. The many records of jury trials which we review on appeal demonstrate no pattern showing routine disregard of the trial court's instructions. Indeed, so contrary is our view that we presume, unless the record expressly shows otherwise, that juries conscientiously follow an explicit cautionary instruction promptly given. *LeVasseur v. Commonwealth*, 225 Va. 564, 589, 304 S.E.2d 644, 657 (1983).

■ Finally, the Commonwealth argues that even if the trial court erred in refusing a cautionary instruction, the error was harmless beyond a reasonable doubt because the other evidence of the defendant's guilt was overwhelming. We cannot agree. The direct evidence of the defendant's participation in the crime consisted entirely of incriminating admissions testified to by Susan Sowell. It was corroborated by circumstantial evidence consisting of the defendant's conflicting explanations given just after the killing, and the testimony of Garnett Merryman, who testified to Ward's relationship with the defendant and Ward's communication with her and subsequent suspicious behavior on the night of the killing. After Ward, as a defense witness, had denied criminal knowledge or participation, his statement to the police that the defendant had solicited him to murder her husband was compelling and persuasive corroboration of Susan Sowell's testimony. It might have been the only factor inducing the jury to believe her. We cannot, therefore, say that the error was harmless beyond a reasonable doubt.

Accordingly, the judgment of conviction will be vacated, the order appealed from reversed, and the case remanded to the Court of Appeals with direction to remand the same to the trial court for a new trial, if the Commonwealth be so advised.

*Reversed and remanded.*