## COMMERCIAL DISTRIBUTORS, INC., T/A SOUTHERN MANOR HOME FOR ADULTS

### V.

### SHELBY BLANKENSHIP, ADMINISTRATRIX OF THE ESTATE OF JACKIE ALLEN EPPLING

Record No. 900158

November 9, 1990

Present: All the Justices

*Richard C. Rakes; Melissa J. Warner (Gentry, Locke, Rakes & Moore*, on briefs), for appellant.
*Harry F. Hambrick, Jr.* for appellant.

JUSTICE RUSSELL delivered the opinion of the Court.

A mentally-ill resident of a licensed home for adults left the premises of the home and died by suicide. His personal representative brought this action, contending that the home was negligent in three respects: (1) in failing "to hospitalize" the resident sooner, (2) in failing to restrain or monitor the resident after a decision to hospitalize him had been made, and (3) in failing to maintain an adequate staff. This appeal raises questions concerning negligence, proximate cause, and the necessity for expert testimony.

## I. FACTS

Jackie Allen Eppling (Eppling) was 46 years old at the time of his death on January 30, 1988. He had been diagnosed as a paranoid schizophrenic and had suffered from mental illness for about 25 years. He had a long history of recurrent hospitalizations, treatment, and release. Although he had been in hospitals for periods as long as three or four years at a time, Eppling had resided at a licensed facility in Roanoke, originally known as the Whitehall Home for Adults, during most of the time following his release from a mental hospital in 1981.

The Whitehall Home for Adults was acquired by Commercial Distributors, Inc. in the mid-1980's and was thereafter operated under the trade name Southern Manor Home for Adults (the Manor). The Manor was a residential facility licensed under the provisions of Code § 63.1-172, *et seq.*, and operated under regulations promulgated by the Board of Social Services pursuant to Code § 63.1-174. The statutory definition of a "home for adults" is a "place, establishment, or institution . . . operated or maintained for the maintenance or care of four or more adults who are aged, infirm or disabled . . . ." Code § 63.1-172(A).

Although 90% of the residents at the Manor were mentally disabled, it was neither a hospital nor a nursing home. It provided room, board, laundry, and housekeeping services to the residents who were generally free to come and go as they liked. There were no medically-trained personnel on the staff. The Manor did not give medical, psychiatric, or psychological treatment and was not equipped to perform nursing services except in the most limited circumstances. The residents consulted health care professionals of their own selection, outside the Manor. The Manor's only health care responsibility was to dispense to the residents such medications as the residents' physicians might prescribe. The administrator, Judith A. Hartman, a licensed practical nurse, was responsible for the day-to-day management of the Manor. The remaining employees were housekeepers and aides. Typically, three such employees would be on duty at all times, but their efforts were divided among 72 residents who lived in 27 rooms located in two buildings on the Manor's premises.

If a resident became ill, the Manor arranged for transportation to his or her physician's office. In an emergency situation, the administrator would call the resident's physician, ask for a hospital admission, and have the resident transported directly to the hospital after the physician made arrangements for the admission. Requests of this kind were sometimes denied. If hospital admission was sought on the grounds of mental illness, the administrator would try to persuade the resident to seek voluntary admission. If that failed, the administrator could resort to the courts for an order of involuntary commitment.

Eppling had expressed suicidal ideas on a number of occasions. In 1985, he had been treated at Roanoke Memorial Hospital and the hospital's records, which were sent to the Manor, mentioned the danger of suicide and the need for precautions during hospitalization. Eppling was not discharged, however, until he was no longer considered suicidal by the attending physicians.

In 1986, Eppling's sister-in-law, Kathryn A. Moore, found him on 10th Street in Roanoke near the Wasena Bridge. Eppling told her that he was going to the bridge to jump off and kill himself. Mrs. Moore reported this to the Manor. Immediate steps were taken to secure an involuntary commitment, and Eppling was hospitalized. Again, Eppling was released to return to the Manor when the attending physician deemed his condition no longer suicidal.

In 1987, a Roanoke detective found Eppling at the Wasena Bridge in a distraught condition. Eppling told the detective that he wanted to jump off the bridge but could not "get up the nerve." This resulted in another period of hospitalization. Again, Eppling was released to return to the Manor when the danger of suicide was considered past.

Although his behavior was often irrational, there was nothing in Eppling's statements or behavior, from the time of his return to the Manor on July 1, 1987, until his death on January 30, 1988, to suggest to the Manor's personnel that he had again become suicidal. Yet, on the morning of January 30, 1988, he walked out of the Manor, unbeknownst to any of its personnel, walked to the Wasena Bridge, and jumped to his death. He died by drowning in the Roanoke River at 9:30 a.m.

Much of the evidence at trial concerned Eppling's behavior during the days immediately preceding his death. The plaintiff contended that Eppling's bizarre conduct during that period, coupled with the Manor's knowledge of his earlier "suicidal ideation," was sufficient to create a duty on the Manor's part to take reasonable action to protect him from self-injury.

Dr. Narendra C. Shah, a Roanoke psychiatrist, had been Eppling's personal physician since May 1986. After Eppling's discharge from the hospital in July 1987, Dr. Shah saw him regularly as an outpatient. During the autumn of 1987, Eppling's behavior was often bizarre and his thinking paranoid and delusional; it did not, however, suggest any danger of suicide. During the remainder of 1987, Dr. Shah never again thought it necessary to hospitalize Eppling.

On January 6, 1988, Eppling told Dr. Shah that he had had "a good Christmas," and Dr. Shah was pleased with his progress. During an office visit on January 27, however, Eppling appeared with a packed suitcase and told Dr. Shah that he wanted to go to Southwestern State Hospital at Marion. Dr. Shah examined him, reviewed progress notes from the Manor describing his recent behavior there, concluded that hospitalization was unnecessary, and returned him to the Manor. Dr. Shah sent a progress note to the Manor that day making no mention of any suicidal tendencies. At trial, Dr. Shah testified that he did not consider Eppling suicidal at that time.

About the same time, on a day she could not recall with certainty, Esther E. Eppling, Eppling's mother, received a visit from

her son. She later telephoned the Manor and told a "nurse" that Eppling was "bad off" and ought to be hospitalized. She had no fear of suicide but was concerned about his safety in crossing streets while walking about in the city.

On January 29, Judy Hartman, the Manor's administrator, became concerned about Eppling's behavior. She was aware that he had sought voluntary hospitalization on the 27th when visiting Dr. Shah, and she asked him if he would voluntarily "sign himself" into Roanoke Memorial Hospital. Eppling refused to do so, and Mrs. Hartman decided that his behavior at that time was not sufficient to warrant involuntary commitment through judicial proceedings.

At 7:00 p.m. on January 29th, an aide made a log entry that Eppling was "ranting and raving." Later, a resident reported that he had fallen in his room. Two aides found him lying on the bathroom floor with a small cut above one eye, which they dressed. He appeared to be in satisfactory condition, if somewhat "groggy." No more was heard from him during the night.

About 6:50 a.m. on January 30, Ellen Harris, an aide working on the morning shift, found Eppling sitting on the floor in a hallway, against the wall. Because he was trembling and complaining of a stomach ache, she called the rescue squad. A team of paramedics arrived at 6:55 and found Eppling to be alert, oriented, and responding appropriately to questions. He complained of nausea and abdominal pain and asked to be taken to Catawba Hospital, about 30 miles from Roanoke. He was told that the rescue squad could only take him to the emergency room of a local hospital, but Eppling refused that offer. The team escorted him back to his room where he asked for a cigarette. The paramedic in charge of the team testified that he saw no reason to hospitalize Eppling at that time.

Later, Eppling left his room to go to breakfast. He lit a cigarette and then extinguished it in a glass of milk. When an aide took Eppling's medicine and a cup of water to him, he cursed her and threw the water in her face. After Ellen Harris had finished serving breakfast, she called Mrs. Hartman at her home and reported Eppling's behavior during the morning. Mrs. Hartman then decided that Eppling's condition had deteriorated to the degree that an involuntary commitment was warranted. She told Ellen Harris to get Eppling's belongings ready for a trip to the hos-

pital. This call was logged at 8:15 a.m. and lasted 10 to 15 minutes.

Ellen Harris testified at trial that Eppling was not seen anywhere on the Manor's premises after this call. After his belongings were packed for the hospital, two aides searched the premises thoroughly but were unable to find him. One aide also called Eppling's mother to ask if he had gone to her home and was told that he had not. Mrs. Harris was not particularly alarmed because residents were free to come and go as they liked, and Eppling frequently left without mentioning his plans for the day. Further, he had given no indication in his statements or conduct of any suicidal intent at that time.

Coincidently, about 8:00 a.m., Eppling had gone to the building adjacent to the one in which he lived to visit Quince Irving, an employee of the Manor. Irving was on friendly terms with Eppling, was unaware of his recent behavior, and did not know of any plans to hospitalize him. Irving gave Eppling a cigarette and suggested that he rest in the day room. Eppling gave Irving no indication of any intent to injure himself. Irving testified at trial that he left work at approximately 8:15 to drive home. En route, he saw Eppling walking normally on 10th Street, about eight blocks from the Manor. Irving sounded his horn; Eppling turned, waved his hand, and smiled at him. Irving perceived nothing unusual in this and drove home.

As soon as Mrs. Hartman completed her telephone conversation with Ellen Harris, she called Dr. Shah and related the events of the morning. Dr. Shah agreed that Eppling had become so disturbed that he should be hospitalized, although he testified at trial that his conclusion was not based upon any concern about the danger of suicide. The conversation ended about 8:55 a.m. Dr. Shah arranged for a hospital bed while Mrs. Hartman sought a temporary detention order. The court issued such an order at 10:05 a.m. As noted above, Eppling jumped from the Wasena Bridge at 9:30 a.m.

## II. PROCEEDINGS

Eppling's sister qualified as his administratrix and brought this action against the Manor. Both parties filed pretrial motions. The court, in a pretrial order, limited the issues to those mentioned above, namely: negligence in (1) the Manor's failure "to hospitalize" Eppling sooner, (2) the Manor's failure to monitor Eppling's

whereabouts or detain him while arrangements were being made to hospitalize him, and (3) inadequate staffing. The Manor contended that expert testimony should be required to support each of the plaintiff's three theories of negligence. In a written opinion, the court ruled that the first two theories "involve administrative or ministerial matters not requiring expert testimony" but that the third theory "does involve technical or, complex matters of opinion" requiring expert testimony to establish a standard of care.

At trial, the plaintiff called no expert witnesses for this purpose and abandoned the third theory, the inadequate-staffing theory of negligence. After the evidence was taken and the defendant's motions to strike were overruled, the plaintiff's case went to the jury on the first two issues. The plaintiff's case was supported only by lay testimony, although the defendant called expert witnesses in its case. The jury returned a verdict for the plaintiff in the amount of $500,000. Overruling post-trial motions, the court reduced the verdict to $200,000, the amount of the *ad damnum* clause, and entered final judgment in that amount on November 13, 1989. We granted the defendant an appeal.

## III. EXPERT TESTIMONY

■ The Manor's first contention is that the trial court erred in failing to require expert testimony to support the plaintiff's first and second theories. The plaintiff contends that the allegedly negligent personnel were lay persons, not professionals, and that they were subject only to the duty to exercise ordinary care. That standard of conduct, the plaintiff argues, is readily comprehended by juries in negligence cases, and needs no explication by expert witnesses. We agree with the plaintiff that, with respect to the second issue, no expert testimony was necessary. The issue whether, in the exercise of ordinary care, the Manor's personnel should have been more vigilant to monitor Eppling's whereabouts after the decision had been made to hospitalize him is merely a question of the precautions a reasonably prudent person would have taken in like circumstances - a traditional jury issue requiring no expert testimony. *See Richmond Newpapers* v. *Lipscomb*, 234 Va. 277, 296, 362 S.E.2d 32, 42 (1987), *cert. denied*, 486 U.S. 1023 (1988).

■ We do not agree with the plaintiff's contention concerning the first issue. The question whether Eppling should have been hospitalized sooner is not a matter laymen are equipped to resolve.

Ordinarily, only a qualified health care professional can determine whether a patient's illness has progressed to the point where hospitalization is warranted. For that reason, hospitals ordinarily do not admit patients except on the orders of a physician to whom such authority has previously been granted. Except in the most obvious circumstances, the determination of the time when hospitalization is warranted in any patient's case is not a matter of such general knowledge in the community as to negate the need for expert testimony. That determination usually requires specialized knowledge and skill, involving both the diagnosis of a patient's illness and an assessment of its severity. Thus, a jury is frequently unable to make such a determination without the benefit of expert testimony. *See Maricopa County v. Cowart*, 106 Ariz. 69, 72, 471 P.2d 265, 268 (1970). To the extent the pretrial order defined the first issue as the Manor's failure "to hospitalize" Eppling sooner, a decision based on medical judgment, we conclude that the trial court erred in dispensing with the requirement of expert testimony on that issue.

## IV. NEGLIGENCE

The plaintiff argues, however, that although the Manor might not, by its own efforts, have been able to "hospitalize" Eppling, it was negligent in failing to *seek* hospitalization sooner. On this point, we agree with the plaintiff that expert testimony was not required. We must examine the record, therefore, to determine whether there is any evidence to support a finding that the Manor delayed in taking such steps as a prudent lay person would have taken in like circumstances to bring to the attention of a qualified physician facts reasonably indicating the danger of suicide.

The plaintiff relies on the Manor's knowledge of Eppling's suicidal ideation in prior years, coupled with his increasingly disturbed condition during the two days before his death. The plaintiff emphasizes the telephone call from Eppling's mother and his behavior on January 29. As noted above, however, Mrs. Eppling expressed no fear of suicide when she telephoned the Manor; she was concerned for her son's safety in crossing busy streets.

The evidence is uncontradicted that Eppling expressed no suicidal thoughts during the six-month period before his death. On January 27, when he visited Dr. Shah and asked to go to Southwestern State Hospital, Dr. Shah concluded that he was not sui-

cidal and not in need of hospitalization. On January 29, Mrs. Hartman asked Eppling if he would "sign himself into" a hospital, but Eppling refused. On January 30, less than three hours before his death, Eppling was examined by an experienced paramedic who saw no reason to hospitalize him.

No contention is made that the facts would have warranted the Manor in seeking an involuntary commitment before the morning of January 30, and the only evidence on the timeliness of that action was Dr. Shah's testimony that the Manor acted without undue delay. Neither the Manor's application for involuntary commitment nor the court's detention order indicates that any of the parties to the proceeding entertained a fear that Eppling had become suicidal. The court order reads, "THE FACTS are as follows: delusional, psychotic, agitated, not sleeping." This is in marked contrast with detention orders issued in 1985 and 1986, both of which characterized Eppling as "suicidal."

■ We conclude that the record is devoid of evidence from which the jury might have inferred that the Manor was negligent in failing to take such steps as a reasonably prudent lay person would have taken to secure Eppling's hospitalization sooner. Therefore, the court erred in submitting the first issue to the jury.

We now turn to the second issue. The Manor contends that the plaintiff failed to produce any evidence of negligence concerning its lack of diligence in keeping track of Eppling after the decision to hospitalize him had been made. The Manor also argues that, even if there was evidence from which the jury could infer such negligence, the record is devoid of any evidence from which the jury could find that any such negligence proximately caused or contributed to Eppling's demise.

## V. PROXIMATE CAUSE

■ Assuming, without deciding, that there was sufficient evidence to support an inference of negligence on the second issue, we agree with the Manor that there was no evidence to support a finding of proximate cause. Any negligence to be charged to the Manor on this issue is necessarily confined to a narrow interval of time. The decision to hospitalize Eppling was made by Dr. Shah after he had heard Mrs. Hartman's report during a telephone conversation that ended at 8:55 a.m. Eppling's death occurred 35 minutes later, some distance away from the Manor's premises.

There was no evidence at trial from which the jury could find that Eppling was on the Manor's premises at any time after 8:55 a.m.

■ Although the Manor had a duty to exercise ordinary care for the safety of its residents, that duty was limited to its own premises. The Manor did not have a duty to supervise its residents after they had left its premises, as they were free to do, or to monitor their whereabouts on the streets of the city. Adult homes are neither hospitals, nursing homes, nor custodial institutions. *See* Code § 63.1-182.1. They exist pursuant to statutes intended to provide a residence for persons under disabilities, offering those persons the greatest degree of freedom and participation in normal life consistent with their conditions. *Id.*

■ Although hospitals and nursing homes are included within the definition of "health care provider" in Code § 8.01-581.1, adult homes are not so included. We think the omission to be significant, and hold that adult homes of the kind under consideration here are not held to the standard of care which applies to health care providers. We further hold that, subject to the provisions of Code § 63.1-182.1, such homes do not have a duty to care for the health, welfare, and safety of their residents when such residents are absent from the home's premises.

## A. Prior Inconsistent Statements

The plaintiff argues, however, that there was evidence before the court from which the jury could find that Eppling was physically present on the Manor's premises after the decision to hospitalize him had been made. Although Ellen Harris testified at trial that she had seen Eppling sitting in a hallway before she called Mrs. Hartman, the plaintiff sought to impeach that testimony by showing that Mrs. Harris had made prior inconsistent statements on two occasions.

In a pretrial deposition, Mrs. Harris testified that she thought she had seen Eppling in the hall *after* her conversation with Mrs. Hartman. She had made a similar statement to Donna Baber, an employee of the Department of Social Services, who, in February 1988, conducted an investigation of the circumstances surrounding Eppling's death. Based on her interviews with Mrs. Harris and other witnesses, Mrs. Baber prepared a written "Sequence of Events" which was introduced in evidence. That exhibit contained an entry, based solely on Mrs. Harris' statements, which read:

"8:15 - 8:30 A.M. Ms. Harris saw Mr. Eppling sitting on bench in hallway as she went to laundry room to get him clean clothes."

At trial, confronted with these inconsistent statements, Mrs. Harris said that she had been "confused" on the earlier occasions, and adhered to her testimony that she had seen Eppling before, but not after, her conversation with Mrs. Hartman. There was no other evidence that Eppling was on the Manor's premises after 8:55 a.m., but there was evidence that thorough, fruitless, searches were made for him in both buildings.

■ Witnesses may be impeached by proof of prior inconsistent statements, but Virginia adheres to the common-law rule that such statements are inadmissible hearsay if offered to prove the truth of their content. When such statements are offered to impeach a witness, the opposing party is entitled, upon request, to a cautionary instruction advising the jury that the statements are to be considered only insofar as they may affect the credibility of the witness, and may not be considered as proof of the truth of their content. *Pugh* v. *Commonwealth*, 233 Va. 369, 374, 355 S.E.2d 591, 595 (1987).

■ The plaintiff argues on appeal that the prior inconsistent statements should be considered as substantive evidence of the truth of their content because (1) opposing counsel did not object to their admission, and (2) opposing counsel did not request a cautionary instruction. We do not agree. The plaintiff was entitled to introduce the statements for the purpose of impeachment and opposing counsel had no basis for any objection. Failure to make a frivolous objection has no effect on the character of the evidence. Although opposing counsel was entitled to a cautionary instruction upon request, *id.*, he was also free to waive it if he chose. *Id.* at 375, 355 S.E.2d at 595. As we commented in *Manetta* v. *Commonwealth*, 231 Va. 123, 127 n.2, 340 S.E.2d 828, 830 n.2 (1986), counsel may wish to avoid such an instruction for sound tactical reasons. "The court [is] not required to give such an instruction *sua sponte*. Such instructions may sometimes give particular emphasis to the portions of testimony specifically mentioned by the judge, a result the parties may wish to avoid." *Id.* Therefore, neither the Manor's failure to object to the evidence nor its waiver of a cautionary instruction had the effect of converting the hearsay content of the impeaching statements into substantive proof of their truth.

## B. Conclusion

■ We have defined proximate cause as "that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, *and without which that event would not have occurred." Banks* v. *City of Richmond,* 232 Va. 130, 135, 348 S.E.2d 280, 282 (1986) (quoting *Beale* v. *Jones,* 210 Va. 519, 522, 171 S.E.2d 851, 853 (1970)) (emphasis added).

■ Under the evidence in the record, any negligence on the Manor's part occurring after 8:55 a.m. was completely disconnected from Eppling's death. It could not have been an "act or omission which . . . produce[d] the event." Neither could it be said that without it "that event would not have occurred." Indeed, under this evidence, Eppling's suicide would have occurred despite the greatest imaginable diligence the Manor might have exercised upon its premises after the decision to hospitalize him had been made.

■ Although the issue of proximate cause is generally a matter for determination by a jury, the jury cannot infer it from a vacuum. *See Beale,* 210 Va. at 522, 171 S.E.2d at 853. The burden is upon the plaintiff to establish a causal connection between the defendant's alleged negligence and the injury of which the plaintiff complains. *State-Planters Bank & Trust Co. v. Gans,* 172 Va. 76, 81, 200 S.E. 591, 593 (1939). Here, finding no evidence in the record from which the jury could have found that any negligence on the Manor's part was the proximate cause of Eppling's death, we conclude that the trial court also erred in submitting the second issue to the jury.

Accordingly, we will reverse the judgment of the trial court and enter final judgment for the defendant.

*Reversed and final judgment.*

JUSTICE COMPTON, with whom CHIEF JUSTICE CARRICO joins, dissenting.

Because the plaintiff is armed with the verdict of a jury approved by the trial judge, the facts should be viewed in the light most favorable to the plaintiff. When the evidence is considered in this manner, I am of opinion that all questions relating to primary negligence and proximate cause were jury issues. And, although

the majority bypasses the negligence question relating to monitoring Eppling's whereabouts, all the evidence on negligence furnishes the background for consideration of the issue of proximate cause.

In a thorough written opinion overruling defendant's motion to set aside the verdict on the liability issues, the trial judge set forth some of the facts upon which she relied on the issue of primary negligence.

> "Defendant kept Eppling in its home for adults with full knowledge of his medical condition, including his prior suicide threats. Hartman, the administrator, recognized a pattern in Eppling's behavior that he had been progressively more delusional since before January 16, 1988. Hartman acknowledged that Southern Manor is not capable of taking care of someone who is suicidal. Hartman never communicated to Harris and Irving any information concerning Eppling's prior suicidal threats. Once the decision was made to hospitalize Eppling, it was not communicated to Irving, no one stayed with Eppling until the hospitalization could be effected, and his departure from the premises was never even reported to the administrator. On the basis of the foregoing facts, a jury could reasonably find that defendant failed to exercise ordinary care for Eppling. Where the evidence is such that reasonable men might differ as to its effect, it is for the jury to say whether the defendant failed to exercise ordinary care for the plaintiff's well being."

I fully subscribe to this analysis of the evidence on that issue.

The trial judge likewise articulated her view of the evidence on the question of proximate cause and foreseeability.

> "There existed sufficient evidence before the Court upon which a jury could have reasonably concluded that the negligence of the defendant in not hospitalizing Eppling sooner or in not monitoring his whereabouts while awaiting the warrant to hospitalize put in motion a natural and continuous sequence—Eppling leaving the home unattended, walking to the Wasena Bridge, and jumping to his death. From the evidence the jury could have concluded that absent the failure to hospitalize earlier or to monitor the whereabouts of Eppling the death would not have occurred.

"Defendant argues that Eppling's injury was not reasonably foreseeable and relies upon the testimony of its expert witness, Dr. Brown, who testified that even a trained psychiatrist has difficulty predicting suicide. Yet Dr. Brown attributed a significance of about 2.5 on a scale of 10 to Eppling's prior suicidal threats or ideations. When asked where on that scale he would be willing to take a chance with an individual's life he responded, 'double zero.' A jury could have reasonably concluded that the defendant proximately caused Eppling's injuries by taking that '2.5' chance which their own expert testified should not have been taken; and, therefore, it was proper to submit the issue for their consideration.

"Furthermore, the precise injury sustained need not have been foreseeable. It is sufficient if an ordinary person should have, under the circumstances, foreseen that an injury might occur. . . . There was evidence from which the jury could conclude that the defendant should have foreseen possible injury to Eppling in the absence of hospitalization or monitoring, given his deteriorated condition, . . . Accordingly, there existed sufficient evidence regarding proximate cause for the matter to be submitted to the jury."

I also endorse this treatment of the proximate cause issue.

Accordingly, I would affirm the judgment of the trial court.

I have additional problems with the majority opinion. In the first place, I disagree that the plaintiff was required to produce expert testimony to establish a standard of care for these lay persons, not professionals, on the issue whether the defendant should have hospitalized Eppling sooner. The plaintiff did not charge the defendant with professional negligence in the malpractice sense. As the majority points out, the Home was a residential facility with no medically trained staff. The Home's function was to provide nonmedical, administrative, routine care to safeguard a mentally ill person unable to care for himself. Yet the majority has decided that expert testimony of "specialized knowledge and skill, involving both the diagnosis of a patient's illness and an assessment of its severity," must be produced to evaluate the performance of defendant's lay employees. I believe that the ability to make such evaluation lies within the range of common experience and common knowledge of lay jurors unaided by expert opinion.

In the second place, I have a more basic objection to the entire expert-witness discussion by the majority. In my view, it is wholly unnecessary to the opinion and amounts to pure dictum.

The majority rules in favor of the defendant on the merits and enters final judgment in defendant's favor. This result is based on the idea that the record itself, without reference to the need for expert testimony, is "devoid of evidence from which the jury might have inferred that the Manor was negligent in failing to take such steps as a reasonably prudent lay person would have taken to secure Eppling's hospitalization sooner." The result is also based on the further idea that, assuming there was sufficient evidence of negligence, without reference to the need for expert testimony, to establish that defendant should have monitored Eppling's whereabouts after the decision to hospitalize, "there was no evidence to support a finding of proximate cause."

I submit that, under these circumstances, there is no necessity to proceed to consider the complaints of error by the party prevailing on appeal regarding evidentiary issues relating to negligence. If final judgment is to be entered for defendant, I would avoid discussion of this irrelevant matter; the majority should assume, without deciding, that expert testimony was not required.