COURT OF APPEALS OF VIRGINIA

Present:  Judges Benton, Elder and Senior Judge Hodges
Argued at Richmond, Virginia


SAIFULLAH K. NIAZI

                                                MEMORANDUM OPINION[*] BY
v.       Record No. 2283-02-2              JUDGE JAMES W. BENTON, JR.
                                                      MARCH 9, 2004
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                     Robert W. Duling, Judge Designate

          William W. Tunner (Thompson & McMullan, P.C., on brief), for
          appellant.

          (Jerry W. Kilgore, Attorney General; Amy Hay Schwab, Assistant
          Attorney General, on brief), for appellee.  Appellee submitting on
          brief.


        A trial judge convicted Dr. Saifullah Niazi of causing or creating a public nuisance, Code

§§ 48-2 and 48-5, and of permitting the continuation of a public nuisance, Code §§ 48-1 and 48-6.

Dr. Niazi contends that the trial judge committed five errors:  (1) ruling that a limitation on

testimony could cure the presentment, which Dr. Niazi alleges was defective because it was based

upon conduct occurring more than a year prior to the date of the presentment, (2) considering

evidence of events that occurred outside the one-year limitation period circumscribing a

presentment, (3) finding Dr. Niazi guilty when a limited liability company owns and operates the

assisted living facility, which was alleged to be a nuisance, and owns the real property, (4) finding

Dr. Niazi guilty for failing to perform actions which were legally prohibited, and (5) ruling the

_____

        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

evidence was sufficient to prove Dr. Niazi created and permitted a public nuisance to continue. We

hold that the public conduct of the residents of the assisted living facility was not Dr. Niazi's

responsibility, and we reverse the convictions.

I.

On June 27, 2000, a grand jury issued two presentments alleging that "Saifullah K. Niazi

unlawfully . . . caused . . . or created" and "unlawfully . . . permitted . . . to continue" a public

nuisance "from on or about May 1998 to May 2000" at an address in the City of Richmond. In his

opening statement at trial, the prosecutor indicated the evidence would prove that the Old Dominion

Adult Home failed to properly supervise and care for its residents and that, as a result, the residents

were improperly dressing for the weather, panhandling, disrupting traffic, and searching trash bins

for food. The prosecutor also asserted that the residents assaulted people and have been arrested for

drinking in public. The prosecutor was "not asking for the home to close down" but, instead, sought

to reform the manner in which the home was managed. The attorney for Dr. Niazi indicated that the

Home is not a hospital or nursing facility and that Dr. Niazi is limited by statute and state

regulations to the restraints he can impose on the residents.

The evidence at trial proved Dr. Niazi is a psychiatrist and is the owner and chief executive

officer of Best Care, LLC. Best Care operates an assisted living and residential care facility for

adults, which is licensed by the Virginia Department of Social Services under the name Old

Dominion Adult Home. See Code § 63.2-100 and Code § 63.2-1800 through § 63.2-1808. The

Home, which is located in the Carytown section of the City of Richmond at the address listed in the

presentment, is licensed to house eighty-nine residents. The residents of the Home are either elderly

or suffer from some physical or medical handicaps, and they require assistance with daily activities,

help with taking medication, or some level of supervision. The evidence indicates that ninety

percent of the residents come to the Home after being discharged from a state mental hospital or from a hospital's psychiatric ward, and the residents are usually referred to the Home by the local community services board, hospitals, a family member, or a social worker. The Home is subject to the Department's rules and regulations for licensed adult care residences.

Several residents and merchants of Carytown testified about their experiences with some of the Home's residents. A merchant described one incident in which a customer ran into her store and reported that a man, whom she could not awaken, was blocking the front doors. The merchant called the police to have the man removed. When a police officer arrived, he recognized the man as a resident of the Home. The officer surmised that the man had fallen asleep and did not get his medication, and the officer took the man to the Home. The man's clothes were soaked, and his pants were "so big that they just fell down" when he walked.

The merchant also testified that on another occasion when she passed one of the residents on the sidewalk, the man "got right up in [her] face, and he said: Give me some money." The merchant testified that she did not feel "threatened" and told him she had no money. The man moved away and went to another person seeking money. The merchant also testified that she had attended a meeting about the residents and she concluded that Dr. Niazi's plan to have an employee walk by "a couple of hours a day, basically police the neighborhood to try to find the residents" was ineffective. She also recalled that an employee from the Home came to her store twice when she was away and left a card.

Another merchant testified that one of the residents had panhandled in front of her store on five or six occasions. When she asked him to stop, he responded that "[she did not] own the sidewalk, and [she] could not tell him what to do." As she asked him again to move, he "closed his fist and came at [her] with his fist swinging." She then called the police and the manager of the

Home.  A police officer and the manager of the Home came and led the man away.  The merchant also testified that residents of the Home often "pick up cigarette butts, [and go] through trash cans" but do not "necessarily interact with the customers or the store owners."

The merchant recalled that another resident, who often purchased coffee in her store, constantly spilled the coffee on the sidewalk and "would throw up" on the sidewalk outside her door.  When he did so, another resident, Robert, would take him back to the Home.  The merchant described Robert as being "highly functional" and often did odd jobs for store owners.  On one occasion, however, she told him to leave her store after he asked her customers for a dollar.  On another occasion, a resident of the Home rushed into her store, asked her to call for an ambulance, and said he did not want to return to the Home.  Instead, she called the manager who came within five minutes and took the protesting resident to the Home.  She further testified that generally she received a "fairly decent response" from the manager when she called about a resident and that she was aware that some residents, including Robert, had been transferred from the Home.

Another merchant, who also lived in Carytown, described aggressive panhandling by a resident of the Home.  She said the resident, who smelled of urine, became increasingly aggressive and confronted her about thirty times.  She also observed other residents of the Home eating items they retrieved from the trash and aggressively asking for money to buy food.  She described an incident in which a resident was sitting at a bus stop in slippers and a robe, which was open.  She believed he had no clothes underneath the robe.  She saw other residents walk into streets without heeding traffic.  She testified that she never called the manager when she observed these incidents.

Several residents of the Carytown area testified about similar incidents of residents panhandling, wearing clothing inappropriate for the weather, walking in the streets and knocking on car windows, and displaying aggressive behavior and other inappropriate conduct.  One resident

testified that she contacted the Department and the Home about the problems and that they "move[d] a couple of people out, but not the . . . people . . . [she] saw every day." Another resident testified that she believed the Home had an obligation to supervise its residents when they are in the neighborhood.

Officer John Sheppard, a police officer assigned to the Carytown area, testified that he saw several residents of the Home with open containers of alcohol in a park and charged them with violating the city's ordinance prohibiting open containers of alcohol. He also described residents who walked in the street and solicited money or cigarettes from drivers. Officer Sheppard recalled one incident involving a "simple assault" and testified that he would issue summonses for violations committed by the residents who seemed competent and knew their conduct was wrong. When he did so, he gave employees at the Home a copy of the summons so they would know of the court dates. When he encountered residents who did not seem mentally competent he told them to go to the Home or he returned them to the Home. He explained that "most of the time if any of the residents were . . . causing . . . either [a] violation of some ordinance or criminal type activity, if we asked them to go home, most of them understood . . . what we were asking them to do . . . and . . . they would go back to the home."

The officer and the other witnesses testified about meetings the manager of the Home and members of various civic and business associations attended. The officer described the topics as follows:

> A: That the residents were wandering the streets; not properly clothed during the wintertime, either in short sleeve shirts, no shoes and socks on their feet; going through trash cans and eating out of trash cans; picking up cigarettes off the side of the street and smoking them; wandering into the trash on Cary Street; using the bathroom in the yards and alleyways behind the residents' houses. And, actually, I think there was even an occasion where one of the

residents wandered up into a resident's house one morning while . . . the house owner was having breakfast.

Q: And these were stressed to them in the meetings?

A: Yes.

Q: Do you remember whether a representative, Dr. Niazi, or [the manager] stating anything about -- to address these concerns from those meetings, if you recall?

A: The one thing that was brought up in the meeting that I can remember is that these folks have rights. We can't lock them up in the . . . home. We can't make them stay there. They have rights.

Q: That's what you remember?

A: That's the one thing that I can remember. There may have been some other conversations . . . .

Denise Bonaparte, an employee of the Department of Social Services who is responsible for licensing adult homes, testified that residents of the Home "have freedom of movement" to leave at their discretion. She also testified that the employees of the Home cannot forbid the residents from going to the commercial area and its environs and further "cannot just arbitrarily remove" the residents from the streets in the area. She further testified that the operators of the Home "are trying to meet the requirements" of the licensing agency, that the Home is in "substantial compliance" with licensing requirements, and that the Home is not in danger of losing its license for violations cited during routine inspections.

In response to the judge's question about "Who actually places these individuals," she testified as follows:

It could be anybody. It would be the local community services board. It could be a family member. It could be a social worker who makes the referral or the recommendation that this person needs what we call assisted living care. They may be unable to live alone. They may have difficulty with medication, not being able to determine which medication . . . to take at which time.

- 6 -

They may have difficulty bathing. They need help with what we call daily living activities, and they need supervision.

She also testified that the Department's employees monitor levels of supervision when they conduct their inspections.

After the Commonwealth concluded its evidence, Dr. Niazi testified that many of the residents of the Home are persons who have been discharged from state mental hospitals. He also testified that the Department and other social service agencies initially determine the level of care the residents need and approve placement for them in "a nursing home, or personal independent home, or assisted living like . . . Old Dominion." He described the classification of assisted living as follows:

> [I]n assisted living, they have two levels of care in itself. One is called residential care, which means these people are really ambulatory. They are in remission or partial remission from their illness, whether mental or physical. And they pretty much need very minimal supervision. The only thing we really do for those people is to give them their medicine on time; and make sure that they are fed, give them all their meals; and, you know, they have a building which is adequately heated and cooled and very well maintained.

> Beyond that, they can come and go anytime that they feel like it. They are not considered legally incompetent. They are all competent, unless you declare them incompetent through a Circuit Court. So technically the problems come in, because these people have exactly the same rights as citizens like anybody else. They can come and go freely from the home. . . . I can hire 200 staff members, but they can still go on their own anytime they feel like going and come back anytime. The home is only required to file a complaint of a missing person if the resident does not return within 24 hours. And then we can file a complaint like that.

> But they're referred by the hospitals, social workers, and through UAI, Uniform Assessment. And they assign them the level of care. So they deem them appropriate for a licensed adult home.

Dr. Niazi also testified that to remove a resident from the Home he had to give a reason and thirty days notice and that he had removed some residents from the Home without their consent "[t]o work with the merchants."

At the conclusion of the evidence, the trial judge found the following:

> And, you know, I am very sympathetic to the people that have to live or work around this place when things aren't properly supervised. And the deciding factor in my mind was not the shear number of incidents, which I counted over 40 different incidents, the factor in my mind is that it's the same people over, and over, and over, and over. I mean, I almost feel like I know Robert, and I've never seen him before in my life. And so there is no question in my mind, based on the evidence that's been received here today, that between the period of May 1999 and May 2000 that a public nuisance was created.
>
> And then I listened very carefully at the end, and I was thinking: All right. The home can't control who they get or who they don't get. But the truth is if [a resident] was that much of a problem, they could have taken him and sent him somewhere else. The State is not forcing the home to keep these people. I know we're doing the [Pontius Pilate] thing and washing our hands of some unfortunate individual. But when the home can't be supervised, and hurting the rights of the residents and the businesses, then he has an obligation to do something about it. And during the period of May 1999 to May 2000, he didn't.

The trial judge convicted Dr. Niazi of two misdemeanors and directed him to devise a plan of abatement, acceptable to the Commonwealth. A year later, another circuit court judge sentenced Dr. Niazi to pay a fine of $10,000, of which $9,000 was suspended for twelve months, on the conviction for causing a nuisance and to pay a fine of $1,000, suspended for twelve months, on the conviction for permitting the nuisance to continue. This appeal followed.

II.

By a pretrial motion, Dr. Niazi objected that the presentments were fatally defective because they charged two misdemeanor counts "from on or about May 1998 to May 2000" but were issued on June 27, 2000, more than one year after May 1998. Noting that Code § 19.2-8

provides that "[a] prosecution for a misdemeanor . . . shall be commenced within one year next after there was cause therefor," he argued that the presentments should be dismissed. Dr. Niazi also argued that the judge could not know what testimony influenced the grand jury's decision to issue presentments spanning twenty-four months. The trial judge ruled that the presentments were "not jurisdictionally flawed," amended the presentments to reference the period from May 1999 to May 2000, and ordered that no evidence would be admitted about events occurring prior to May 1999.

(A.)

Dr. Niazi argues that the trial judge erred when he ruled that the presentments, which alleged that nuisances occurred more than a year prior to the date of the presentments, were not "fatally defective." We disagree.

"[I]t is necessary where there is a statute of limitations (as in this case) barring the prosecution after a certain time, that such facts should be stated in the indictment as will show that the offense charged was committed within the statutory period." Shiflett v. Commonwealth, 114 Va. 876, 877, 77 S.E. 606, 607 (1913). Not all defects require reindictment, however. Code § 19.2-231 provides, in pertinent part, as follows:

> If there be any defect in form in any indictment, presentment or information, or if there shall appear to be any variance between the allegations therein and the evidence offered in proof thereof, the court may permit amendment of such indictment, presentment or information, at any time before the jury returns a verdict or the court finds the accused guilty or not guilty, provided the amendment does not change the nature or character of the offense charged.

Prior to the presentation of evidence, the trial judge amended the presentments to cover the period from May 1999 to May 2000. The amendments narrowed the time alleged in the presentments and did not change the nature of the offense charged. See Puckett v.

- 9 -

Commonwealth, 134 Va. 574, 584-85, 113 S.E. 853, 856 (1922); Flanary v. Commonwealth, 133 Va. 665, 667, 112 S.E. 604, 604 (1922). With the amendment, Dr. Niazi still had "notice of the nature and character of the accusations against him" and raised no colorable claim that he could not "adequately prepare to defend" himself against the charges. Willis v. Commonwealth, 10 Va. App. 430, 437-38, 393 S.E.2d 405, 409 (1990). Indeed, by narrowing the period of time, the amendments had the effect of providing a greater protection to Dr. Niazi's substantive rights because they reduced his exposure to the potential number of events the prosecutor could prove. Therefore, we disagree that the presentment was "fatally defective." We hold that the defect was only in the form of the indictment and that the trial judge did not err in ruling that the nature of the offense was not changed by amending the presentments to narrow the time period of the alleged nuisance.

(B.)

Dr. Niazi further argues that the trial judge erred in considering evidence of events that occurred prior to June 27, 1999. Specifically, Dr. Niazi refers to testimony given at trial concerning an event that occurred on June 11, 1999, which was more than one year prior to the date of the presentments.

The record reflects, however, that the trial judge first rejected the argument that the presentments were fatally defective. He then amended the presentment to limit its coverage to the period from May 1999 to May 2000. No objection was raised to the period of time as amended. Later, during the testimony of a witness at trial, the following occurred:

> Q: Can you tell us, the incident that you were writing about, was that on June 11, 1999?
>
> A: Yes, it was.

          *          *          *          *          *          *          *

> [Defense attorney]:  Objection, Judge.  That's prior to the July '99 dates.
>
> [Judge]:  No.  I'm letting them go from May 1999 to May 2000.
>
> [Defense attorney]:  Okay, Judge.

In view of the lack of objection earlier to the period of time as amended, the attorney's response at trial, "Okay, Judge" indicates the attorney had acquiesced to the ruling limiting the evidence from May 1999 to May 2000.  When a "defendant acquiesce[s] in the trial court's ruling, he may not challenge it on appeal."  Weeks v. Commonwealth, 248 Va. 460, 473, 450 S.E.2d 379, 388 (1994).  See also Spruill v. Commonwealth, 221 Va. 475, 478-79, 271 S.E.2d 419, 421 (1980) (noting that defendant acquiesced in the ruling by responding "Very well" to the ruling).  For these reasons, we hold that this issue is barred by Rule 5A:18.

### III.

Dr. Niazi contends that Best Care, a limited liability company, owns and operates the Home and that another limited liability company, Ampak, L.L.C., owns the real property.  He argues, therefore, that the trial judge erred in finding him guilty of creating or permitting a public nuisance.

On brief, Dr. Niazi notes that this issue arose in the circuit court at his sentencing hearing, which was conducted by a judge who did not convict Dr. Niazi.  At the sentencing hearing, Dr. Niazi's trial attorney asserted that he presented this information "not to suggest that there is a jurisdictional defect; not to suggest that that should upset the findings of the Court; not to suggest that in the way of a motion to dismiss."  The attorney indicated that he "wasn't asking

that it be thrown out or dismissed" but, rather, that he raised the issue "in case there was a need for an amendment."[1]

We have held "there is no ruling for use to review" when an attorney "failed to obtain a ruling" from the judge, "requested no relief," and "was denied nothing by the trial court." Fisher v. Commonwealth, 16 Va. App. 447, 454-55, 431 S.E.2d 886, 890 (1993). This is the precise circumstance that exists in this case. Accordingly, we hold that this issue is not properly before us on appeal.

IV.

Dr. Niazi contends that the trial judge erred in finding him guilty for failing to perform actions, which are legally prohibited. On brief, the Commonwealth "concedes that state regulations prohibit [Dr.] Niazi from restricting a resident's movement or implementing curfews." Citing the prosecutor's argument at trial, the Commonwealth contends that Dr. Niazi had "a duty of care to his residents" and "created the nuisance by not supervising these residents in an effective manner."

The evidence in this record proved that the Home is a licensed adult residential facility and that the residents are referred to the Home by hospitals and other social service agencies. These agencies assign the residents to a level of care that suggests the residents can appropriately live in an adult assisted living facility. No evidence tended to establish that the Home was not operating in accordance with statutory mandate or the Department's regulations when it permitted the residents to move freely in the neighborhood of the Home.

---

[1] We note, however, that during the trial the judge commented that "Mr. Niazi is the owner of the property . . . . That's stipulated." The parties apparently assented to the ruling because no objection was stated.

Bonaparte, the licensing administrator with the Department of Social Services, testified that she supervises the inspections and monitoring of adult homes. She testified that the residents of the Home are not patients and that Dr. Niazi cannot force the residents to dress for the weather, but he can make recommendations to them. She also testified that the residents cannot be restricted to the Home and that the administrators of the Home "cannot just arbitrarily remove [the residents]." To remove a resident, the administrators would have to follow the Department's regulations. Bonaparte explained as follows:

> Q: If Dr. Niazi came and said, I want to help these merchants out. They've made a great investment. They've got a lot of money in their shops, and I want to do something for them. So I won't let anybody out after 9:00 at night; would that cause your agency some concern?
>
> A: If someone called, and there is a complaint -- If I had -- If the inspector went out at 9:00 at night and found out that there was a restriction in terms of the resident's movement, then she would right it up in the violation notice.
>
> Q: What are the restrictions with resident movement?
>
> A: They have no restrictions.
>
> Q: So if a resident wants to leave the premises and go out onto Cary Street, for any reason or purpose, does Dr. Niazi have to allow the resident to do that?
>
> A: Yes, he does.

In Commercial Distributors, Inc. v. Blankenship, 240 Va. 382, 397 S.E.2d 840 (1990), the personal representative of a person who had resided in a residential home providing adult care brought a negligence claim against the home after the resident committed suicide. The resident had a long history of mental illness and recurrent treatment. Id. at 385, 397 S.E.2d at 842. The day the resident died, he had left the home in the morning without anyone's knowledge

and jumped off a bridge.  Id. at 387, 397 S.E.2d at 843.  Holding that the adult home was not

negligent, the Supreme Court explained the duty of care that such homes are required to exercise:

> Although the [adult care home] had a duty to exercise ordinary
> care for the safety of its residents, that duty was limited to its own
> premises.  The [home] did not have a duty to supervise its residents
> after they had left its premises, as they were free to do, or to
> monitor their whereabouts on the streets of the city.  Adult homes
> are neither hospitals, nursing homes, nor custodial institutions.
> They exist pursuant to statutes intended to provide a residence for
> persons under disabilities, offering those persons the greatest
> degree of freedom and participation in normal life consistent with
> their conditions.
>
> . . . We further hold that subject to provisions of Code
> § [63.2-1808], such homes do not have a duty to care for the
> health, welfare, and safety of their residents when such residents
> are absent from the home's premises.

Id. at 393, 397 S.E.2d at 846 (citations omitted).

Bonaparte explained that, before a person is approved to live in the Home, an individual

assessment is made to determine the person's suitability for an adult assisted living facility.  She

said that if a resident later caused a problem, then the resident would be referred to a hospital for

an evaluation.  She testified that the Home has complied with any recommendations for

additional staff that the licensing division previously had made.  Bonaparte further testified that

the Home had taken corrective actions to address concerns about supervision and were in

substantial compliance.

In summary, the evidence established that the Home is an adult residential facility which

assists the residents with their medication, provides shelter and food, and monitors the residents

to the extent that the residents may need an adjustment for medication or an evaluation by a

physician.  These residents, some of whom have mental impairments, are classified by the state

as not requiring constant supervision.  According to the evidence, the regulations under which

the Home operates provides that the Home cannot restrict their residents to the premises or require staff members to accompany them when they leave the facility.  We hold that the public actions of the residents of the adult home were not the responsibility of Dr. Niazi.

V.

We hold, therefore, that the evidence failed to prove Dr. Niazi was the cause of a public nuisance, and we reverse the convictions.  Because we reverse the convictions for reasons stated above, we do not further address the issue of the sufficiency of the evidence.

<u>Reversed</u>.