**FLORISTS' MUTUAL INSURANCE COMPANY, Appellant,**

v.

**William B. TATTERSON, Jr., t/a Tatterson Greenhouses, Appellee.**

**Civ. A. No. 91–29–NN.**

United States District Court, E.D. Virginia, Newport News Division.

Oct. 6, 1992.

Raymond L. Hogge, Jr., Swope, Richard McAllister Williams, Worrell, Kelly, Greer & Frank, Norfolk, Va., for appellant.

Charles S. Russell Jr., Albert Davis Bugg Jr., Rumsey, Breeden, Hubbard, Bugg & Terry, Irvington, Va., for appellee.

## ORDER AND OPINION

DOUMAR, District Judge.

This matter comes before the Court, pursuant to 28 U.S.C. § 636(c)(4), on appeal from a jury trial before a United States Magistrate Judge. The appellee, William B. Tatterson, a greenhouse operator, obtained a judgment for $165,000.00 in this action on an insurance contract which insured his crops and buildings from "direct loss" due to "weight of snow," claiming damages to his crops flowing from a snowstorm. The appellant, Florists' Mutual Insurance Company, denied coverage for alleged crop damage contending that it was not direct. Tatterson also alleged that the insurer failed to exercise good faith in settling the damage to his buildings.

A jury entered an interrogatory verdict of $165,000.00 for damages sustained by Tatterson's plants due to "overcrowding" or "loss of growing space," but did not find any bad faith. Appellant maintains that the Magistrate Judge improperly denied its motion for summary judgment and subsequent motions for a directed verdict and judgment as a matter of law, and that the Magistrate Judge improperly permitted the testimony of one of appellee's expert witnesses about the damages incurred to appellee's business. Appellee cross-appealed on the grounds that the Magistrate Judge gave an improper instruction to the jury in the charge relating to appellee's bad faith claim.

The parties have briefed the issues and this Court has heard argument. This Court holds that the Magistrate Judge erred in denying Florists' Mutual's motion for summary judgment or judgment as a matter of law with regard to Tatterson's claim for damages to his insured crops. Although the Court finds no error in the charges relating to bad faith, it need not address the issue because the Court finds as a matter of law a lack of any bad faith. Therefore, appellee's objection to the instructions is moot. This Court also need not review the Magistrate Judge's decision to allow the testimony of Tatterson's expert witness.

## I. FACTS

Appellant, Florists' Mutual Insurance Company ("Florists' Mutual") is an insurance company which provides casualty and indemnity insurance to plant growers. Appellee, William B. Tatterson, Jr. ("Tatterson"), is the owner and sole proprietor of a commercial greenhouse in Port Haywood, Virginia, where he grows a variety of plants for the wholesale market year around.

### A. *The Business*

Tatterson grows plants during the winter in twenty-nine long, narrow greenhouses which, insofar as this case is concerned, were built in a "Quonset Hut" style with plastic spread over a half-circle metal frame.[1] The greenhouses in question contained ten rows of plants hanging from the metal frames and running lengthwise, with five rows hanging on each half of the structure. Plants were also positioned below the hanging plants on the floor and on benches. Tatterson insured the greenhouses as well as the crops contained therein with the appellant, and this suit is based on that policy.

On Friday, February 24, 1989, a snowstorm caused snow to accumulate on one side of eight of Tatterson's twenty-nine insured greenhouses causing the metal ribs on that side of the greenhouses to sag or

---

1. The insurance policy shows twenty-nine greenhouses. Two of the greenhouses, shown on the policy as numbers 128 and 129, were joined side by side. Although Tatterson referred to those two greenhouses as one, each is separately insured and, therefore, separately considered.

cave in, but not breaking the plastic covering. The plants themselves, insofar as this case is concerned, were not physically damaged during the storm. Tatterson propped up the sagging sides of the greenhouses, but some portions were still hanging too low to properly accommodate the plants which were hanging from the metal frames because some of the hanging plants were too close to the plants on the benches and on the floor.[2]

To alleviate this problem, Tatterson decided to move not more than 19 rows of the 80 rows of hanging plants in the damaged greenhouses to the undamaged sides of some of the damaged greenhouses and to approximately 12 of the undamaged greenhouses. The damaged greenhouses were almost all 148 feet long and 30 feet wide or 4,440 square feet. Assuming 2⅜ rows of hanging plants out of 10 were affected (19 out of 80 rows), then a maximum of 23.-375% of the greenhouses damaged by the storm were affected. That percentage constitutes approximately ¼ of each damaged greenhouse, or 1,110 square feet in each of the eight greenhouses—a total of 8,880 square feet affected. This relocation of the hanging plants, according to Tatterson's experts, caused "overcrowding" and the plants received less than optimal amounts of air and light. After passage of time, the placement of the plants in the overcrowded conditions caused the plants to become "leggy" and "stretched" in comparison to the plants grown in previous years. Although Tatterson testified that the number of hanging plants which he was growing at the time of the storm in 1989 was double the number grown in previous years, the record does not reveal that the experts gave any consideration to this fact in assessing damages or causal connection.[3]

The experts testified that this leggy condition caused the plants to sell for a lower gross sales price than that which Tatterson anticipated. Tatterson himself testified that he had anticipated selling these plants at an expected 50% price rise from $5.00 to $7.50. One expert, a private insurance adjuster who helped present the claim, testified over objection that Tatterson's 1989 crop loss was based on calculations utilizing a projection of ten months of Tatterson's 1989 gross sales. The expert derived the 1989 gross sales price by extrapolating a 13.24 percent growth in 1989 based on the sales from January through October 1987 compared to sales from January through October 1988, and utilizing that percentage of growth[4] for 1989 over 1988. He indicated that sales would increase by $264,430 and that cost of goods in prior years was 79.8 cents of every dollar less some costs that did not rise with increased sales. According to the expert, this would produce a cost of goods or crop loss of approximately $211,000. The economy and other factors were not taken into consideration.

To summarize plaintiff's experts: the leggy condition of the plants resulted from overcrowding; overcrowding was brought

---

**2.** Joint Exhibit 15A shows the eight greenhouses after their sides had been propped and plants had been moved. Assuming that there were initially five rows of hanging plants on each side of the greenhouses, the photographs taken on March 9 indicate that six greenhouses had two rows of hanging plants removed from the damaged side, one had four rows removed, and one had three rows removed. As shown by Exhibit P–36, Tatterson used a different numbering system to identify the greenhouses than was used on the insurance policy: Tatterson's greenhouse number 5 is policy greenhouse number 105; Tatterson's 10 is policy 110; Tatterson's 15 is policy 113; Tatterson's 19 is policy 117; Tatterson's 25 is policy 123; Tatterson's 25 is policy 123; Tatterson's 26 is policy 124; Tatterson's 27 is policy 126; and Tatterson's 28 is policy 125.

**3.** The record of Tatterson's direct examination reveals the following exchange:

Q. Can you describe for the ladies and gentlemen of the jury, give them an idea how '89 compared with previous years, in terms of volume, how much you were growing?
A. Specifically, the hanging baskets we were growing—at the time of the snowstorm, we had double the amount we normally have, and this was due to the last probably three years of us being sold out almost immediately.

Record at 16.

**4.** This figure would be somewhat different using income tax returns for a twelve-month period.

about by movement of the plants; movement of the plants was necessitated by damage to the eight greenhouses; and the damage to the eight greenhouses was in turn caused by weight of snow. This chain of events led to a reduction in the anticipated sales price of the plants from the twenty-nine greenhouses, ultimately inflicting a loss in excess of the maximum limit of liability set forth in the insurance policy, $165,000.[5]

## B. *The Insurance Policy*

At the time of the snowstorm, Tatterson had in effect an insurance policy issued by Florists' Mutual which provided coverage for damages to Tatterson's greenhouses as well as to his plants. Part I of the insurance contract reads as follows:

> this policy covers *direct loss* caused by a *Named Peril* to the structure of a plastic covered greenhouse(s) including fixtures and equipment in use therein and permanently attached to said structure.

(emphasis added). Among the named perils insured under the contract is "weight of snow." Specifically, Part III of the contract states that "[t]his insurance covers Property Insured against *direct physical damage* caused by ... *weight of snow.*" (emphasis added). A related portion of the policy, entitled "Plastic Greenhouse Crop Coverage Endorsement," provided insurance against the loss of the plants grown in the greenhouses. This section stated:

> This endorsement insures growing crops against *direct loss* caused by the *Named Perils* of the policy, only while located within the insured plastic greenhouse structure(s) described in the declarations for which crops coverage is specifically indicated.

(emphasis added).

After the storm, Tatterson sought to recover, under the insurance policy with Florists' Mutual, money for property damage to his greenhouses and for damage to his plants. Florists' Mutual eventually paid Tatterson $45,659.00 for his property damage claim, but refused to compensate Tatterson for any plant damage. The company maintained that any crop damage caused by the alleged overcrowding was not covered by the insurance contract.

Tatterson asserts that he is entitled to recover under the insurance contract for the damages sustained to *all* of his plants due to overcrowding. In essence, Tatterson claims that the sagging roofs caused him to move some plants and this produced overcrowding. Tatterson characterizes the damage resulting from the overcrowding as a "direct loss" caused by "weight of snow" even though most of the plants allegedly affected were never located in portions of the greenhouses damaged by snow.

Tatterson also maintains that, after the storm, Florists' Mutual failed to promptly assess the damage to his greenhouses and assigned an adjuster to examine the damage who was not competent to perform the task. According to Tatterson, if Florists' Mutual had promptly, in compliance with its requirement of good faith, advanced money for the property damage to his greenhouses, the harm to his plants from overcrowding would not have occurred because alternative housing for the plants would have been arranged or built. He indicates that no money or insufficient money was advanced by the insurance company during the first thirty-five days after the storm to build facilities to house the rows of plants which had to be moved.

Tatterson sought to recover (1) $165,000 under the terms of the contract for direct damage to his plants;[6] (2) $670,000 in compensation for Florists' Mutual's alleged breach of its good faith obligations under

---

**5.** The policy itself limited recovery for crop damage to three dollars per square foot with a maximum of 55,000 square feet insured and a total monthly limit of $165,000 for liability. The question of whether $165,000.00 is the appropriate limitation of liability under the facts will not be discussed in this opinion. This Court notes, however, that a total of approximately 8,880 square feet in the eight greenhouses was affected.

**6.** Tatterson's complaint states that he actually incurred $270,000.00 in direct damage to his plants. Tatterson only sought to recover $165,000 in damages because such amount was the maximum amount of coverage under the insurance contract.

the insurance contract to promptly settle Tatterson's claim; (3) $670,000 in compensatory damages for loss of business income and harm to Tatterson's business; and (4) $1,000,000 in punitive damages for Florists' Mutual's alleged intentional misrepresentation and actual fraud.[7]

Tatterson did not indicate in his complaint that he was seeking damages for any injury caused to the plants as a result of direct contact with the walls of the greenhouses or the snow itself. Tatterson acknowledges that he has not sought compensation for plants that may have been damaged by physical contact with the snow or with any of the eight greenhouses that sagged or partially collapsed. *Reply Brief of Appellee and Brief in Support of Cross–Appeal,* pp. 36–37. There is no claim that any plants were physically damaged immediately after the snowstorm. In short, the alleged crop damage occurred weeks later long after there was no snow nor any "weight of snow."

## II. PROCEDURAL HISTORY

Tatterson first brought legal action against Florists' Mutual on or about January 25, 1991, in the Circuit Court of Mathews County, Virginia. On February 25, 1991, Florists' Mutual removed Tatterson's action to this Court, invoking this Court's diversity jurisdiction under 28 U.S.C. § 1332. In accordance with 28 U.S.C. § 636(c)(1) and § 636(c)(4), the parties consented to trial before a United States Magistrate Judge and also consented to appeal directly to this Court.

Before the trial, Florists' Mutual made a motion for summary judgment. Florists' Mutual argued that any damage to Tatterson's plants that occurred subsequent to the snowstorm was not a direct loss caused by the weight of snow within the meaning of the insurance contract. The Court below denied Florists' Mutual's summary judgment motion on September 20, 1991, with a written opinion. The Magistrate Judge found as a matter of law that the

snowstorm had caused a direct loss to Tatterson's plants, stating that:

> The Court does, however, find that when a greenhouse roof collapses from the weight of snow; that plants contained in that greenhouse are damaged; and that the damage is the result of the loss of the growing space caused by the weight of the snow, then, as matter of law, a direct loss has occurred.

In support of his finding, the Magistrate Judge relied on cases from West Virginia and New York which held that the term "direct loss" should be interpreted to mean proximate loss, *Granchelli v. Travelers Insurance Co.,* 167 A.D.2d 839, 561 N.Y.S.2d 944 (1990); *La Bris v. Western National Insurance Co.,* 133 W.Va. 731, 59 S.E.2d 236, 240 (1950), and a North Carolina case stating that a direct loss occurs when the peril is the "efficient and predominating cause ... which produced the damage without any new or intervening cause sufficient of itself to produce the damage." *Wood v. Michigan Miller's Mut. Fire Ins. Co.,* 245 N.C. 383, 96 S.E.2d 28, 30 (N.C.1957). The Magistrate Judge ruled that the Fourth Circuit's decision in *Abady v. Hanover Fire Insurance Co.,* 266 F.2d 362 (4th Cir. 1959), a case which held that the term "direct loss" connotes damage directly due to the "strength or force" of the named peril, was distinguishable from the facts of the present case. The Magistrate Judge implied that the Fourth Circuit's holding as to what constituted direct loss was dicta and, therefore, not binding.

Florists' Mutual again moved for judgment as a matter of law at the close of Tatterson's evidence and also made a motion for a directed verdict which motions were renewed. The motions were denied by the Magistrate Judge for the same reasons expressed in his opinion denying Florists' Mutual's original motion for summary judgment.

The jury returned a verdict for Tatterson on his claim that his plants had been damaged as a result of overcrowding and

---

7. Tatterson's complaint was subsequently amended to add a claim alleging that Florists' Mutual's rejection of Tatterson's September 17, 1990, request for arbitration or appraisal of the damage to his greenhouses constituted a breach of the insurance contract.

awarded Tatterson $165,000.00 under the terms of the insurance contract. The jury found for Florists' Mutual on Tatterson's claim that Florists' Mutual had acted in bad faith. The jury verdict was expressed in answers to the Court's interrogatories as follows:

1. We the jury find that Mr. Tatterson has proven by a preponderance of the evidence that he suffered a plants loss under the insurance policy due to "overcrowding" or a "loss of growing space."

Yes/No _Yes_

2. If the previous answer is "yes", we the jury fix the amount of damages at $ _165,000_

3. We the jury find that Mr. Tatterson has proven by clear and convincing evidence that Florists' Mutual acted in bad faith in adjusting Mr. Tatterson's greenhouse claim.

Yes/No _No_

4. If the previous answer is "yes", we the jury fix the amount of damages at $ _0_

Florists' Mutual filed a notice of appeal on October 22, 1991. Tatterson cross-appealed on October 23, 1991, on the portion of the judgment denying any damages for his claim that Florists' Mutual had acted in bad faith claiming an error in the charge the Magistrate Judge gave to the jury.

### III. ANALYSIS

In reviewing a decision of a Magistrate Judge, a district court should utilize the same standard of review utilized by the court of appeals in reviewing a decision of the district court. *United States v. Fattaleh,* 746 F.Supp. 599, 601 (D.Md.1990); *see also* 28 U.S.C. § 636(c)(4). Thus, findings of fact are reviewed under a clearly erroneous standard and matters of law are reviewed *de novo.*

### A. *Direct Physical Damage Caused by Weight of Snow*

The Court first addresses whether the Magistrate Judge properly denied Florists' Mutual's motions for summary judgment and subsequent motions for a directed verdict and judgment as a matter of

law. Thus, the initial issue before the Court is whether the Magistrate Judge correctly concluded as a matter of law that, given the facts alleged and presented by Tatterson, the damage to Tatterson's plants was a "direct loss" or, more specifically, "direct physical damage caused by ... weight of snow," as defined by the insurance contract. Resolution of this issue obviously depends on the proper meaning of the language "direct loss" or "direct physical damage caused by ... weight of snow."

This is a case based on contract law, not a case based in tort. There is no Virginia case which has decided the issue of what is the proper construction of "direct loss" or "direct physical damage" in any type of insurance contract. As is discussed below, a majority of the courts which have addressed the issue have held that the term "direct loss" means that the peril insured against must be the proximate or the efficient cause of the windstorm. *See* Stephen M. Brent, Annotation, *What Constitutes "Direct Loss" Under Windstorm Insurance Coverage,* 65 A.L.R.3d 1128 (1975); *see also* cases cited *infra.* These cases, however, are not the law of this Circuit and this Court declines to follow them. Even were it to do so, however, the result would be the same.

The Fourth Circuit in *Abady v. Hanover Fire Insurance,* 266 F.2d 362 (4th Cir. 1959), in a case appealed from the Eastern District of Virginia, did address the proper construction of "direct loss". In *Abady,* the plaintiff's building, located in Richmond, Virginia, was damaged when cold temperatures caused the building's pipes to freeze and burst. Plaintiff maintained that a severe windstorm had blown off the cover of a hatch leading from the attic space in the building to the roof. *Id.* at 363. The absence of the cover exposed the pipes near the roof to the cold temperatures causing them to burst. The contract at issue in that case insured against "direct loss by windstorm...." *Id.* After the presentation of the plaintiff's evidence, the district court directed a verdict for the defendant. *Id.*

The Court of Appeals, in upholding the district court's directed verdict, first noted that there was no evidence that the cover of the hatch was in place prior to the windstorm. *Id.* at 364. However, the Court went on to hold that even if there were a conclusive showing that the wind dislodged the hatch, the blowing of the wind was too remote a cause of the actual damage to the plaintiff's property to permit recovery under the insurance contract. *Id.* The Court stated that "direct loss" from a windstorm "connotes damage due to the strength or *force* of the wind." *Id.* at 365. Plaintiff's theory, the Court reasoned, is not premised on the force of the wind, but "on the chemical or physical properties of moving air in that it will absorb and carry away heat, thus facilitating the process of freezing." *Id.* The Court held that such a claim provided "no legal basis for recovery" under the policy. *Id.*

Under the principles annunciated in *Abady*, Tatterson has not demonstrated that the alleged damage suffered by his plants due to overcrowding was a "direct loss" or, more specifically, "direct physical damage caused by ... weight of snow." The evidence presented by Tatterson indicates that the damage to the crops did not result from the "strength or force" of the snow or its weight or any immediate force generated by the storm. Instead, the damage occurred to the crops after Tatterson moved some of the plants originally located in damaged sections of the greenhouses and stored them at length and in close proximity with one another in greenhouses that were not affected by the snowstorm and in undamaged sections of damaged greenhouses.[8] This rearrangement of the plants was not "direct physical damage caused by ... weight of snow."

Any resulting harm to the crops stemmed from Tatterson's decision to move his plants in the manner that he did after the snow had melted.[9] Had the plants not been rearranged, according to the experts, the harm to the unaffected crops resulting from prolonged overcrowding would not have occurred. Immediately after the snowstorm, and after the snow had melted, the damage for which Tatterson is seeking to recover had not taken place. Tatterson claims no direct damage from the weight of snow, only subsequent damage from "overcrowding"—and not just to the plants involved in the incident, but to the entire crop, most of which were never located in the damaged portion of the greenhouses. These damages are at best indirect damages from the weight of snow.

The Court stresses that it is utilizing the jury's finding of fact that the damage to Tatterson's plants was caused by the crowding of the plants, as alleged by Tatterson and testified to by Tatterson's expert, Dr. Lyons. What the Court holds today is that assuming that Tatterson's plants were in fact damaged by crowding in the manner alleged, such damages are not as a matter of law a "direct loss" or, more specifically, "direct physical damage caused by ... weight of snow." Therefore, the crop damage is not covered by the plain words of the insurance contract.

Tatterson maintains that the Fourth Circuit's statement in *Abady* that the wind "was too remote" a cause of the actual damage to allow recovery indicates that the Court was applying a proximate cause standard to determine whether the wind was the "direct" cause of the damage.[10] This Court disagrees. As Judge Boreman stated in *Abady*, "where no such ambiguity exists, the terms of the policy are to be taken and understood in their ordinary

---

**8.** Tatterson stated that by March 10, 1989, two weeks after the storm, the plants were beginning to show stress from the shade caused by the extra plants and that by April the plants began to look "leggy" and "stretched." *Trial Record*, pp. 48–49, 57.

**9.** This assumes that doubling the overall number of hanging plants in 1989 from prior years did not overcrowd them, but later increasing the number of hanging plants in particular

greenhouses by a few percentage points in 1989 did overcrowd them in comparison to prior years.

**10.** As is discussed *infra*, the Court finds as a matter of law that even if a proximate cause standard is applied, the weight of snow from the February 24, 1989, storm was not the proximate cause of the injury to the plaintiff's plants.

sense and the policy must receive a practical, reasonable and fair interpretation consonant with the apparent object and intent of the parties." 266 F.2d at 364.[11]

The Court in *Abady* went on to state that the term "direct loss" by wind should be interpreted in accordance with its "plain, ordinary, and popular sense." *Id.* at 365. Thus, the Court held that the term direct loss "connotes damage due to the strength or *force* of the wind." *Id.* (emphasis in the original). This language requires that in this case the weight of the snow result in some immediate physical damage to the property at issue. The words in the contract are clear, and the intent of the parties is equally clear. The crop's development of legginess due to "overcrowding" or "loss of air space" weeks after the disappearance of any snow could not be "direct physical damage caused by ... weight of snow," especially in plants which were never even near the damaged greenhouses.

There are several cases, some of which are cited in Tatterson's brief, that implicitly note that they are declining to follow the reasoning employed in *Abady* in favor of a proximate cause standard. *Fred Meyer, Inc. v. Central Mut. Ins. Co.*, 235 F.Supp. 540, 543–44 (D.Or.1964); *Federal Ins. Co. v. Bock*, 382 S.W.2d 305 (Tex.Civ.App.1964) (if *Abady* did not adopt a proximate cause standard, it is "contrary to the weight of authority"), *writ ref nre* (Dec. 9, 1964), *and rehg of writ of error overr* (Jan. 13, 1965); *see also St. Paul Fire & Marine Ins. Co. v. Central Park Mobile Homes*, 22 Ariz.App. 557, 561 n. 1, 529 P.2d 711, 715 n. 1 (1974) (characterizing *Abady* as holding that direct loss is limited to "immediate physical damage caused by the strength or force of the wind"). However, *Abady* is to be followed in this circuit. In this case the contract is not ambiguous. "Direct loss" or "[d]irect physical damage caused by ... weight of snow" is clear. There is no

possible way under any reasonable reading of the words of the contract that crops never in greenhouses damaged by the snow could have suffered "direct loss" or "direct physical damage caused by ... weight of snow."

The interpretation placed on the word "direct" by the lower court would cause the word "direct" in the insurance contract to be entirely superfluous. One cannot make "indirect" damages "direct" by calling them "proximate." The lower court should have sustained appellant's motion for summary judgment on this issue or, in the very least, entered judgment as a matter of law for appellant on this issue.

### B. *Proximate Cause*

Tatterson argues that if this Court holds that the Fourth Circuit in *Abady* did not use a proximate cause test, the Fourth Circuit's decision is contrary to the approach taken by the majority of courts that have addressed this issue and should not be followed by this Court. The Court agrees that the Fourth Circuit's interpretation in *Abady* of the term "direct loss" may differ from the interpretation of some other courts, but the result would not differ in this case under Virginia law even if the proximate cause standard were utilized.

■■ Under Virginia law, a proximate cause is the "act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Commercial Distribs., Inc. v. Blankenship*, 240 Va. 382, 397 S.E.2d 840, 847 (1990) (quoting *Banks v. City of Richmond*, 232 Va. 130, 348 S.E.2d 280, 282 (1986)). The definition of proximate cause excludes the intervention of any other culpable and efficient agency. *Banks*, 348 S.E.2d at 282–83 (quoting *Winfree v. Jones*, 104 Va. 39, 51 S.E. 153, 154 (Va.1905)). A critical question in determining whether an event is the proximate

---

11. A Texas court has construed the words "physical loss or damage" in an insurance contract to prevent recovery when eighty-one stabilizers fell to the ground causing the revocation of the warranties covering the stabilizers and therefore rendering the stabilizers valueless. *Glens Falls Ins. Co. v. Covert*, 526 S.W.2d 222, 223 (Tex.Civ.App.1975), *writ ref nre* (Oct. 29, 1975). The Court held that the intent of the parties must be determined from the contract itself where the language is clear and that the words "physical damage" were clear and unambiguous. *Id.* at 223.

cause of an injury is whether there exists a self-operating, intervening cause, disconnected from the primary cause, that produced the injury. *Banks,* 348 S.E.2d at 283.[12]

After reciting many of the rules concerning the application of proximate cause, the Supreme Court of Virginia, in *Banks,* stated that "[t]he more difficult problem is to apply the rules relating to proximate cause to the facts of a particular case." *Id.* In that Virginia case, the City of Richmond supplied natural gas and was on notice of several complaints from a consumer about a gas leak. The court assumed that the city negligently failed to cut off the gas or red line the relevant appliance. A few days later, an explosion occurred when a non-city maintenance man lit a cigarette lighter to find the source of the gas leak. The maintenance man's lighting of the lighter was held as a matter of law to be the proximate cause of the explosion. The city's negligent failure to cut off the gas or redline the appliance was held to be only a remote cause and not a proximate cause of the explosion as a matter of law. *Id.*

■ Here, the damages sought are not for plants within the damaged areas, but to the crop as a whole, that is, plants within twenty insured greenhouses in areas not affected in any way by the "weight of snow." In this case, the facts are clear that a loss to the crop as a whole caused by overcrowding was not proximately caused by "weight of snow." At best, "weight of snow" is, under Virginia law, an indirect or remote cause for the reduction in the sales price of plants in portions of greenhouses unaffected by snow.

As in *Banks, supra,* here there is clearly a separate intervening event. To reiterate, well after the snow had melted and long after the storm, Tatterson decided to move some of the plants from the damaged portions of the eight greenhouses to the undamaged sides of those greenhouses and to twelve other greenhouses that had not sustained any damage. Tatterson's witnesses testified that as a result of this movement, some of the plants were crowded and received less air and light than they would have under normal conditions. The consequence of this was overcrowding which resulted in the plants being of inferior quality than those typically grown by Tatterson in prior years.[13]

When the snowstorm partially crushed Tatterson's greenhouses he could have taken several different courses of action. For instance, Tatterson could have immediately discarded or isolated those plants in the damaged portion of the greenhouse which had to be removed,[14] or he could have made arrangements to have the affected plants stored in other facilities. In either case, no plant would have been damaged due to overcrowding. Tatterson's moving the plants from the damaged to the undamaged portions of his greenhouses and to undamaged greenhouses and leaving them there for a length of time such that they were damaged by overcrowding was not part of a "natural and continuous" sequence that began with the weight of snow

12. The Court is aware that proximate cause is ordinarily an issue for jury determination and that a Court can only decide such an issue when reasonable minds could not differ. *Meeks v. Hodges,* 226 Va. 106, 306 S.E.2d 879, 881 (1983). The Court believes that, even assuming the facts as Tatterson has presented them, as a matter of law weight of snow was not the proximate cause of the injury to Tatterson's plants. However, the Court specifically notes that a finding that weight of snow did not proximately cause the damage is not necessary to this Court's holding that the Magistrate Judge erroneously refused to grant appellant's motion for summary judgment and directed verdict, because of this Court's finding that under *Abady* as a matter of law Tatterson was not entitled to recover for the alleged damage to his plants.

13. Again, the quality of the 1989 plants was evidently compared to the quality of plants grown in previous years without taking into consideration the fact that Tatterson had doubled the number of hanging plants grown in 1989 from the number grown in 1988.

14. While such a course of action would have presumably resulted in harm to those plants, no harm would have come to the plants growing in the twelve greenhouses that were undamaged or in the undamaged portions of the eight damaged greenhouses. Nine greenhouses had no plants moved to them after the storm. There was no effort by any expert to isolate those nine greenhouses from the damage computations.

from the February 24, 1989, snowstorm. *Commercial Distribs., Inc.*, 397 S.E.2d at 847. Rather, the damage was caused by Tatterson's conscious and independent decision to rearrange his plants.

The damage to the plants did not occur immediately and it did not occur in portions of greenhouses that were damaged by the snowstorm. According to Tatterson's expert, Dr. Lyons, the overcrowding took several weeks to begin harming the plants and evidence was presented at trial that it was not until several weeks after the storm that Tatterson began to notice "legginess" in his plants. Tatterson himself indicated that he would have had little or no crop damage if he had received a substantial advance from the insurance company between the tenth and twenty-fourth of March, some fourteen to twenty-eight days after the snowstorm.

The Court first finds that as a matter of law "weight of snow" was not the proximate cause of the damage to Tatterson's plants because Tatterson's decision to move the plants constituted an independent intervening force. *See Banks v. City of Richmond*, 232 Va. 130, 348 S.E.2d 280 (1986). The Court also finds that there was no showing of proximate cause because the damage to the plants was too remote from the snowstorm; the plants were in no way damaged by the weight of snow, but instead were harmed from "overcrowding" which began well after the snow had melted and continued over a period of weeks as a direct proximate result of Tatterson's rearrangement of the plants. The overcrowding occurred in structures and portions of structures undamaged by the weight of snow—it is not reasonably foreseeable that damage to six or seven feet of eight greenhouses would cause overall crop damage to crops in unaffected areas of twenty greenhouses. In short, the insurance policy did not insure against "overcrowding," but against "direct loss" caused by the "weight of snow."

Moreover, the essence of Tatterson's evidence in relation to alleged bad faith is that he did not by choice allow his plants to suffer harm from overcrowding. Rather, Tatterson states that he was forced to do so because Florists' Mutual improperly refused to immediately advance him the necessary funds to restore a structure that would have housed those plants originally located in damaged portions of the greenhouses. Thus, Tatterson reasons that there would have been little or no loss if the buildings had been promptly repaired. If true, this alone would rebut the contention that "weight of snow" was the proximate cause of the damage to Tatterson's plants.

It is the finding of this Court that the Magistrate Judge erroneously refused to grant summary judgment and/or judgment as a matter of law for Florists' Mutual on Tatterson's claim for damages due to overcrowding of his plants.

### C. *Bad Faith*

█ This Court finds no error in the Magistrate Judge's instructions to the jury. Indeed, though plaintiff's objections to the instructions are vague and not specific, it appears that his complaint is with an instruction he himself offered (Plaintiff's Instruction 10A) and the similar corollary instruction offered by the defendant (Defendant's Instruction 8), as well as the specific addendum thereto made at the request of the plaintiff. The Magistrate Judge had mentioned that the plaintiff probably would object before the addendum the plaintiff requested was added, but there is no reversible error in this. In any event, the nature of the plaintiff's objections to the instructions were insufficient at law since they were not definite or specific. Moreover, there is no need for this Court to address plaintiff's objections to the instructions because no instructions on this issue were necessary. This Court concludes that plaintiff has failed to prove that defendant exhibited bad faith. Thus, plaintiff's objections to the instructions on this point are in reality moot.

█ The pleadings indicate that plaintiff's allegation of bad faith is based on defendant's failure to pay by the middle of March an advance for damage sustained by plaintiff's buildings during the February 24 snowstorm. At the latest, plaintiff con-

tends that he should have been paid by April 6. On that date plaintiff refused to deal in any manner with the insurance company until after the. end of his spring crop season in June. Plaintiff cut off communications during this period because, he asserts, he was too busy. Any bad faith under the pleadings ·and facts had to occur before April 6 and after February 24, a period of forty-one days after the snow. The plaintiff quite properly indicates that good faith requires an insurer to make a fair and equitable settlement of claims *under the policy* for which liability is reasonably clear.

Tatterson claimed that ·in approximately 1981, he lost a plastic greenhouse due to the weight of snow and was paid within ten days of the date of the loss by Florists' Mutual. In this case, on February 24, 1989, while insured by a policy obtained from Florists' Mutual in 1987 and renewed with modifications in 1988, weight of snow again damaged several of Tatterson's greenhouses, but did not totally destroy any greenhouse. Tatterson states that he advised the insurer that damage to the greenhouses was such that it had to be corrected immediately. Nevertheless, he received no advances until March 24, 1989. On that date plaintiff received an advance which he characterized as being too little and too late. By April 4, 1989, Tatterson was offered more money, but refused the offer asserting that the amount was still inadequate. Tatterson refused to communicate with Florists' Mutual after April 6, 1989. When communications were reinstated in June, Tatterson was paid. Thus, the plaintiff's theory is that the failure of the company to advance sufficient funds of an unspecified amount between February 24, the date of the snowstorm, and April 6, the date on which he cut off communications with Florists' Mutual.

■ In first-party Virginia relationships, liability for bad faith conduct can only arise from the contract and extends only to situations connected with the policy. *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.*, 798 F.2d 669 (4th Cir.1986), *cert. denied*, 479 U.S. 1091, 107 S.Ct. 1302, 94 L.Ed.2d 158 (1987). There the appellate court held that a cause of action for bad faith had to be based upon contract and seek contractual remedies limited to consequential damages. *Id.* The contract involved in this case addresses when a loss is payable by stating that:

> [t]he amount of loss for which this company may be liable shall be payable sixty days after proof of loss, as herein provided, is received by this company and ascertainment of the loss is made either by agreement between the insured and this company expressed in writing or by the filing with this company of an award as herein provided.

Proof of loss on the buildings was not filed until June on the same date on which the entire proceeds were paid. Assuming a proof of loss had been filed on the day of the incident, February 24, 1989, then no payment would have been required before sixty days thereafter, April 28, 1989, even if.the amount of the payment was agreed upon by the parties. After April 6, 1989, the insured admittedly told the representatives of Florists' Mutual not to bother him until after the spring season was over. Florists' Mutual complied with this request.

The facts concerning the insurer's payment of a claim under a policy eight or nine years before provides no basis in this case for a claim of bad faith on this occasion. It is unknown what the terms of the 1981 policy were, whether the greenhouses were completely destroyed with a fixed liability, or whether the damages were agreed upon. There is no showing of what estimates may or may not have been made in 1981.

In reviewing this entire record, this Court is unable to determine any alleged "bad faith" other than the failure to advance sufficient payments on a potential claim concerning damage to Tatterson's buildings. As stated by Keeton and Widiss, "every insurance contract includes an implied covenant of good faith and fair dealing which requires the parties (both the insurer and the insured) to conduct themselves so that nothing is done which impairs the right of the other to receive the benefit of the agreement." Robert E. Kee-

ton & Alan I. Widiss, *Insurance Law*, sec. 6.2(a)(2) (Practitioner's Ed. 1988). The question becomes what did Florists' Mutual do between February 24 and April 6 that "impair[ed] the right of [Tatterson] to receive the benefit of the [insurance policy]." Evidently, Tatterson's answer is that the insurance company did not pay him a sufficient advance, but nothing in the insurance contract requires Florists' Mutual to have made *any* advance. The next question, then, is whether the insurance contract calls for any payment between February 24 and April 6 of 1989. The plain terms of the policy provide a clear answer: no such payment was necessary. Certainly, Tatterson was upset, but merely causing an insured to be upset does not constitute bad faith on the part of an insurer. Nor does Tatterson's dissatisfaction with the adjuster render Florists' Mutual guilty of bad faith.

The record reveals no acts of the insurer which "impaired" Tatterson's rights under the insurance policy. Moreover, there was no showing of any violation of the terms of the policy on the part of Florists' Mutual. Even had Tatterson submitted a proof of loss on the day of the storm itself, he would not be entitled to payment until April 28, 1989. It is difficult to conceive how the defendant could comply with all terms and conditions of the insurance contract in a first-party relationship and then be held liable for bad faith.

The Court finds as a matter of law that Florists' Mutual in no way impaired the right of Tatterson to receive the benefit of the insurance policy insofar as the claim for damage to his buildings was concerned. The duty to pay did not arise until subsequent to sixty days after proof of loss, and then, and only then, after the amount of loss was fixed. Tatterson never submitted an estimate, never made any appraisal, never did anything but object to the amounts offered. He never suggested what amount would have been adequate, neither then nor now in this case. There was no evidence of what would have been an adequate amount. He merely stated that defendant's offers were inadequate. The money advanced may have been inadequate, but the contract of insurance did not call for any payments until sixty days after the proof of loss and after certain conditions were complied with.

This Court holds as a matter of law that for there to be a bad faith claim, there must be some bad faith that in some way impaired the ability of the insured to receive the benefits of the insurance contract causing the plaintiff damages. Here there was no failure at any time to comply with the terms of the contract nor was there any "bad faith which impaired the plaintiff's rights to receive the benefits of the contract." Moreover, the delay between April 6 and the time Tatterson received payment was brought about by the Tatterson's own conduct. Thus, this Court additionally finds that there is no bad faith after April 6 resulting in damage to the plaintiff.

## IV. CONCLUSION

The Court holds that the Magistrate Judge erroneously refused to grant Florists' Mutual's claim for summary judgment. In view of the pleadings in this case, the plaintiff has proven no facts which entitle him to any verdict. There is no error in the instructions but, in any event, Tatterson's objections to the Magistrate Judge's instructions to the jury are moot. Likewise, Florists' Mutual's claim that the Magistrate Judge erroneously allowed one of Tatterson's expert witnesses to testify as to the amount of damages Tatterson incurred is moot. The judgment on the jury's verdict awarding Tatterson $165,000.00 for damages is, accordingly, REVERSED AND VACATED. Judgment is hereby entered for the defendant.

The Clerk is DIRECTED to send a copy of this order to counsel for all parties and to the United States Magistrate Judge.

IT IS SO ORDERED.